NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240444-U

NO. 4-24-0444

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 17, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| DEON K. MOORE, | ) | No. 22CF387 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | J. Jason Chambers, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding (1) the evidence was sufficient for a rational trier of fact to determine defendant was in possession of an actual firearm for purposes of his conviction of count II of the indictment; (2) the trial court's incorrect recitation of the jury instruction setting forth the State's burden of proof did not amount to prejudicial, plain error requiring a new trial when, after the incorrect recitation, the court provided the correct instruction to the jury in writing; (3) the State did not shift the burden of proof onto defendant during its closing argument; and (4) the statute prohibiting a felon from possessing a firearm was not unconstitutional, either on its face or as applied to defendant.

¶ 2    Following a jury trial in March 2023, defendant, Deon K. Moore, was convicted of two counts of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2022)). Defendant was sentenced to two concurrent terms of 12 years' imprisonment, to be served consecutively to his sentence for a prior felony conviction in Livingston County. Defendant appeals, asserting multiple grounds for reversal. For the reasons that follow, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4                              A. Defendant's Charges

¶ 5            On April 27, 2022, the State charged defendant by a bill of indictment with two counts of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2022)). Count I alleged that, on or about February 28, 2022, through March 1, 2022, defendant knowingly possessed a pistol on or about his person or in his abode and that he had been convicted, in Livingston County case No. 16-CF-271, of a Class 1 felony under the Illinois Controlled Substances Act (720 ILCS 570/100 *et seq.* (West 2016)). Count II alleged the same facts, except a revolver, not a pistol, was the firearm at issue there. A jury trial was held on March 6 and March 7, 2023.

¶ 6                                  B. Jury Trial

¶ 7                                  1. *Stipulations*

¶ 8            At the start of trial, the trial court accepted a series of stipulations entered between the State and defendant's counsel. The stipulations were: (1) defendant was convicted of the qualifying felony offense alleged in the indictment; (2) Illinois State Police forensic scientist Jason List would testify he examined and test-fired the pistol at issue in count I of the indictment and "determined it to be an operable firearm as defined by Illinois law"; (3) Bloomington police detective Dave Ashbeck would testify he possessed the pistol, the extended pistol magazine, and the seized ammunition "and was unable to identify any latent prints on the items that would be suitable for identification"; and (4) a proper chain of custody had been maintained over the cell phones, pistol, extended pistol magazine, and ammunition between their seizure by police and the time of trial.

¶ 9                                    2. *Sergeant Richard Beoletto*

¶ 10           Bloomington police sergeant Richard Beoletto was the supervisor of the street crimes unit in February 2022. In this capacity, Sergeant Beoletto used a covert social media account to monitor defendant's accounts. On February 28, 2022, Sergeant Beoletto discovered several posts on defendant's Facebook account referring to a music video that had been uploaded to YouTube. Sergeant Beoletto viewed the music video and used an application called "Snagit" to preserve it. Sergeant Beoletto recognized four individuals in the video, specifically, defendant, Marquon Locket, Damarian Andrews, and Steven Russell. (While watching the video in court, Sergeant Beoletto identified defendant as the individual wearing a red jacket and backwards white ballcap.) On April 21, 2022, Sergeant Beoletto was at defendant's home to arrest him and determined, based on the "configuration of lights, cabinets and floor," this was the location in which the video was filmed. Sergeant Beoletto testified that while, in other investigations, he has seen videos containing disclaimers indicating the guns being used are "props," he did not see one in the video in question. Regardless, the addition of such a disclaimer does not "mean anything" to Sergeant Beoletto.

¶ 11           A series of screenshots from the video were admitted into evidence. Sergeant Beoletto identified the person standing next to defendant, in State's exhibit No. 2D, holding "what appear[ed] to be a firearm," as Damarian Andrews. A "distinctive label," bearing the word "ethika," was affixed to the magazine of the firearm. Sergeant Beoletto was then directed to State's exhibit No. 2J, another photo in which defendant appeared, this time smiling and pointing what appeared to be a firearm at the camera. The State asked, "Now, looking at that revolver, in every respect does it appear to be genuine?" Sergeant Beoletto answered, "Yes, it does," and elaborated, "If you look in the cylinder to the right as you're looking at it, the lower full cylinder of the firearm

appears to have the projectile portion of a round of ammunition that is visible." On cross-examination, Sergeant Beoletto conceded "they make replica firearms" and it was "possible" that "they make replica ammunition," too.

¶ 12                                    3. *Detective Jason Law*

¶ 13            Bloomington police detective Jason Law worked in the street crimes unit in February 2022 under Sergeant Beoletto's supervision. Detective Law testified that, on February 28, 2022, he viewed "a portion" of a music video posted to defendant's Snapchat account (bearing the username "Lilfreshhhh," which defendant confirmed was his username), which he regularly monitored. Detective Law used another officer's department-issued cell phone to preserve the Snapchat video. Detective Law testified the entire video was "posted to YouTube and some other social media account." While watching a portion of the video in court, Detective Law identified defendant as the individual wearing a red jacket and identified Marquon Locket as the individual holding the same firearm he had when Detective Law arrested him on a warrant "about a week and a half after [Detective Law] viewed this video." (Detective Law recovered two iPhones, this particular firearm, and an extended magazine in the vicinity of Locket's arrest, Locket having discarded them while fleeing from Detective Law after being pulled over to be arrested.) A label bearing the word "ethika," which is "some kind of clothing brand," was affixed to the magazine of this firearm.

¶ 14            In this video, Detective Law observed a "nightstand" with "two firearms" on it. One firearm was the one Locket had when Detective Law arrested him. Detective Law identified defendant, in photos recovered from one of Locket's phones, holding this particular firearm inside his residence. (On April 21, 2022, Detective Law was at defendant's home to arrest him and determined, based on the position of the "cabinet" and "light fixtures," this was the location in

- 4 -

which the video was filmed.) Defendant was holding the firearm with the "extended magazine upside down," and Detective Law was able to "see just the beginning of the ethika label right by [defendant's] pinky finger" in one of the pictures. The second firearm was "a revolver." Detective Law identified a "black handgrip," a "lighter portion," which is the "hammer of the revolver," and "the silver portion *** where the body starts." In another photo, defendant is seen with the "handle" of the revolver "sitting on his pant's [*sic*] pocket." When asked if there were any indications the revolver was "real," Detective Law stated, "[W]here the ammunition would be in the firearm and one of the chambers, there's a discoloration that's different from the other chambers. It could be ammunition."

¶ 15                                    4. *Video of Defendant's Police Interview*

¶ 16            After arresting defendant on April 21, 2022, Detective Law interviewed him at the police station. Approximately seven minutes of defendant's interview was played for the jury. Defendant admitted he held the pistol in the music video, but he said, "That's why we put props on all our videos." Detective Law responded, "But they're not props," to which defendant responded, "Nah, I'm saying, but it's for the video shoot." Detective Law said, "The props is [*sic*] for the police." Defendant responded, "I know what you mean." Detective Law explained the guns were taken to a crime lab and test-fired to determine if they were real, so "the whole prop thing doesn't work in this case." Defendant answered, "I'm not saying that. I'm saying that's what they put on the videos." Defendant denied knowing who owned the revolver. Detective Law asked, "Is that revolver still in your house?" Defendant answered, "No," because he has his "baby in there."

¶ 17                                    5. *Closing Arguments*

¶ 18                                    a. The State's Argument

¶ 19            The State argued the evidence established defendant's joint and constructive

possession of the firearms. The State then addressed the evidence of the revolver being a real firearm, as opposed to a toy, noting defendant would not use a toy and be "outgunned by his buddies." The State pointed out in the interview defendant "agreed it was a real revolver," but now "it's just gone."

¶ 20                                  b. Defense Counsel's Argument

¶ 21          Defendant's counsel emphasized "[t]he revolver was never found." Accordingly, "[i]t was never tested like the [pistol] was." Counsel reminded the jury that Sergeant Beoletto "conceded people make replica guns, prop guns, fake guns." Counsel argued the police were trained in firearms but lacked details about the weapon. Therefore, if the firearm was indeed authentic, the officers should have provided more comprehensive details about the weapon.

¶ 22                                  c. The State's Rebuttal

¶ 23          In rebuttal, the State said, "There's no way this convicted felon is going to handle a toy gun while his buddies had a real one. There's no way." The State argued defendant never admitted the gun was a prop. When defendant was asked if the revolver was still at his house, he admitted it was not. The State contended that since the gun was no longer there, it must have been a real revolver, questioning why one would dispose of a toy.

¶ 24          6. *The Trial Court's Recitation of the Jury Instructions*

¶ 25          The trial court then recited the jury instructions. Pertinent to one of the issues raised in this appeal, the court read Illinois Pattern Jury Instructions, Criminal, No. 18.08 (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 18.08). As to the portion germane to this appeal, the court stated:

> "If from your consideration of all the evidence that [*sic*] any
>
> one of these propositions has not been proved beyond a reasonable

doubt, you should find the defendant not guilty.

If you find from your consideration of all of the evidence that any one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty."

Upon retiring to deliberate, the jury was provided written instructions, including the correct IPI Criminal No. 18.08, which recited the proposition for count II correctly, replacing the word "each" with " 'any' of these propositions."

¶ 26                              7. *Verdicts and Sentences*

¶ 27        After deliberating, the jury found defendant guilty of both counts of the indictment. On April 27, 2023, the trial court sentenced defendant to concurrent sentences of 12 years' imprisonment, to be served consecutively to the sentence imposed in the predicate felony case in Livingston County. On May 25, 2023, defendant filed a motion to reconsider his sentence, contending it was excessive. On March 8, 2024, the court denied the motion.

¶ 28        This appeal followed.

¶ 29                              II. ANALYSIS

¶ 30        On appeal, defendant first argues his conviction on count II should be reversed outright because the State failed to prove beyond a reasonable doubt the alleged revolver was a real firearm. Second, defendant argues his convictions must be vacated and he must be granted a new trial due to the trial court incorrectly reciting the jury instruction pertaining to count II before providing the correct instruction in writing. Third, defendant contends the State improperly shifted the burden of proof to him during its closing argument. Finally, defendant argues his convictions must be vacated because the statute prohibiting felons from possessing firearms is unconstitutional, both on its face and as applied to him.

¶ 31    A. The Evidence Was Sufficient to Sustain Defendant's Conviction on Count II

¶ 32    First, defendant argues "the State did not present evidence that the object that looked similar to a silver revolver in the pictures met the statutory definition of a firearm." At most, the State proved defendant "possessed an object that looked like a revolver in photos." Additionally, Sergeant Beoletto conceded the existence of replica firearms and the possibility replica ammunition also existed. It is "merely possible" the object was a real firearm, even if "any trier of fact determined the State's witnesses were one hundred percent credible, that their testimony carried great weight, and drew any and all reasonable inferences from the evidence." In response, the State contends "the inferences that flow from the evidence support the jury's conclusion that the revolver was a firearm." This conclusion is supported by defendant's interview with Detective Law. Sergeant Beoletto and Detective Law also testified "the videos and pictures revealed specific characteristics of the revolver that led them to conclude it was likely real."

¶ 33    In arguing the State did not prove the alleged revolver was an actual firearm, defendant challenges the sufficiency of the evidence to sustain his conviction. As our supreme court has explained:

> "A criminal conviction will not be set aside on grounds of
> insufficient evidence unless the proof is so improbable or
> unsatisfactory that there exists a reasonable doubt of the defendant's
> guilt. [Citation.] The standard for reviewing a challenge to the
> sufficiency of the evidence is well settled. When reviewing the
> sufficiency of the evidence to sustain a verdict on appeal, the
> relevant inquiry is 'whether, after viewing the evidence in the light
> most favorable to the prosecution, any rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis omitted.) [Citations.] The same standard of review applies when reviewing the sufficiency of evidence in all criminal cases, regardless of whether the evidence is direct or circumstantial. [Citations.] Circumstantial evidence alone is sufficient to sustain a conviction where it satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Pollock*, 202 Ill. 2d 189, 217 (2002).

¶ 34     Defendant was prosecuted under section 24-1.1(a) of the Criminal Code of 2012, which provides, in pertinent part:

"It is unlawful for a person to knowingly possess on or about his person or on his land or in his own abode or fixed place of business *** any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a) (West 2022).

A "firearm" is defined as "any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas," subject to various exceptions not pertinent to this appeal. 430 ILCS 65/1.1 (West 2022).

¶ 35     This court concludes the evidence was sufficient for a rational trier of fact, viewing it in the light most favorable to the prosecution, to conclude the object at issue was a real revolver, and therefore was a "firearm" under the applicable statutory definition, such that defendant's conviction on count II can be sustained. Sergeant Beoletto recognized defendant in the music video and the location in which it was filmed as his residence. Sergeant Beoletto identified defendant in

the screenshot (State's exhibit No. 2J) in which he smiles and points what appears to be a firearm at the camera. Sergeant Beoletto agreed that "in every respect" the firearm, which the State posited was a "revolver," "appear[ed] to be genuine," explaining he could see "the lower full cylinder of the firearm appear[ing] to have the projectile portion of a round of ammunition that is visible." Detective Law testified about observing a "nightstand" with "two firearms" on it in one of the screenshots from the portion of the video posted to Snapchat. One of them was "a revolver." Detective Law specifically pointed out its "black handgrip," "hammer," and "body." Detective Law also described seeing, in a photo on Locket's phone, defendant with the "handle" of the revolver "sitting on his pant's [*sic*] pocket." In explaining the indications of the revolver being "real," Detective Law testified, "[W]here the ammunition would be in the firearm and one of the chambers, there's a discoloration that's different from the other chambers. It could be ammunition."

¶ 36 During his interview after being arrested, defendant told Detective Law, "We put props on all our videos," only to respond, "I know what you mean," when Detective Law said, "The props [*sic*] is for the police." When Detective Law admonished defendant "the whole prop thing doesn't work in this case," defendant answered, "I'm not saying that. I'm saying that's what they put on the videos." This can easily be interpreted as a concession that the firearms at issue were *not* props, but *others* involved in the production of the video may have indicated they were props. This is particularly so in that defendant indicated he knew what Detective Law meant when the latter intimated the police are familiar with suspects claiming firearms of which they are illegally in possession of during the production of music videos are actually props. Additionally, when Detective Law asked, "Is that revolver still in your house," defendant answered, "No," because he had his "baby in there," indicating nothing to suggest the object in question was merely

a prop and not a real revolver. There was no discernible reason why he would have felt compelled to have it removed from his home and out of the reach of his baby other than it being a real revolver.

¶ 37　　　　Perhaps most importantly, the jury was informed at the start of the trial the parties stipulated to the pistol, also seen and used in the music video, being "an operable firearm as defined by Illinois law." The jury necessarily viewed the evidence as to the "reality" of the revolver in the context of what it learned at the outset—that the *other* object *was* a real firearm (such that the only outstanding issue with respect to defendant's culpability on count I was whether he knowingly was in possession of it, as the jury also learned of the stipulation of his predicate felony conviction). This would lend additional support to the conclusion the alleged revolver *was* a real firearm. A rational trier of fact could reasonably conclude there is no reason one of the two objects at issue was real, as freely acknowledged by defendant's own attorney, and yet, inexplicably, the other object was merely a prop.

¶ 38　　　　This court is persuaded by the State's comparison of the instant case to *People v. Travis*, 2024 IL App (3d) 230113. In *Travis*, the defendant was convicted of unlawful use of a weapon by a felon. *Id.* ¶ 1. On appeal, the defendant argued the State did not prove beyond a reasonable doubt "he possessed an actual firearm." *Id.* The defendant and his cousin created three cell phone videos "showing both of them holding handguns while sitting in a car with a third person." *Id.* ¶ 3. A detective testified as to his belief the firearms were "real firearms" and his professional familiarity with firearms. *Id.* ¶ 4. The parties also stipulated the defendant was convicted of predicate felony offenses. *Id.* The trial court found the defendant guilty. *Id.* ¶ 5. In so doing, "the court noted it was familiar with firearms and in fact had previously owned the same model of firearm brandished by [the] defendant in the video." *Id.* The appellate court affirmed the defendant's conviction against his challenge to the sufficiency of the evidence. *Id.* ¶ 14. The

appellate court noted the videos "were sufficiently clear to allow [the detective] to identify both [the] defendant and the specific model of the firearm possessed by [the] defendant." *Id.* Additionally, the detective "testified to his familiarity with firearms in general and with the particular firearm possessed by [the] defendant in the videos." *Id.* The trial court, therefore, was allowed "to draw the reasonable inference that [the] defendant possessed a real firearm as defined by the [Firearm Owners Identification Card] Act." *Id.* In the instant case, considering the aforementioned evidence (and the substantial similarities with *Travis*), it was eminently reasonable for a rational trier of fact to have concluded the alleged revolver was in fact real and therefore constituted a "firearm" for purposes of finding defendant guilty of count II. Although circumstantial, this court cannot say the evidence adduced as to the "reality" of the revolver was "so improbable or unsatisfactory that there exists a reasonable doubt of *** defendant's guilt." *Pollock*, 202 Ill. 2d at 217.

¶ 39    Defendant argues that "Illinois case law rejects the notion that any object described as a gun 'is what it is and appears to be,' " referring specifically to *People v. Crowder*, 323 Ill. App. 3d 710, 712 (2001). However, the State correctly points out *Crowder* is distinguishable from the instant case, as the underlying issue before the appellate court was different. In the instant case, the very sufficiency of the evidence to sustain defendant's conviction is at issue, whereas the propriety of the trial court's dismissal of the defendant's indictment after the State destroyed the firearm which formed the basis for his charges of unlawful possession of a weapon by a felon and willful use of weapons was the focus of the appeal in *Crowder*. *Crowder*, 323 Ill. App. 3d at 711-12. As the court explained, "Without being able to inspect the weapon and examine it and its outward appearance, defendant would not be able to refute in any meaningful way the State's contention that it was a firearm." *Id.* at 712. It is in that context that the passage from *Crowder*

- 12 -

which defendant quotes must be read. We decline to expand the import of that passage beyond its contextually proper significance, and we affirm defendant's conviction on count II.

¶ 40   B. The Trial Court's Incorrect Recitation of the Pertinent Jury Instruction Did Not Have a Prejudicial Effect on Defendant, Requiring a New Trial

¶ 41   Second, defendant argues his convictions should be vacated and his case remanded for a new trial due to the prejudicial effect of the trial court's incorrect oral jury instruction in relation to count II. Specifically, the court orally instructed the jury it could find defendant guilty if it found the State had proven beyond a reasonable doubt *any* of the two propositions set forth in the instruction. As defendant stipulated to a predicate felony conviction, "the incorrect jury instruction essentially directed the jury to find [him] guilty without finding that the State proved beyond a reasonable doubt that [he] possessed a revolver firearm." While the court eventually did provide a correct written instruction, defendant argues it "did not cure this serious error which questioned the integrity of the trial and judicial process" since "it cannot be determined which of the contradictory instructions of the burden of proof the jury relied on." In response, the State acknowledges the court provided an incorrect oral instruction, but it contends the error was "harmless" in that "it strains credulity to suggest, as defendant does, that the jury convicted [him] of the offense of possession of a weapon by a felon for merely being a felon without concluding he possessed the weapon at issue, a firearm."

¶ 42   Defendant acknowledges he forfeited this issue but urges this court to review it for plain error.

"In *People v. Enoch*, 122 Ill. 2d 176, 196 *** (1988), the supreme court unequivocally held that for an issue to be preserved for review on appeal, the record must show that (1) a

- 13 -

contemporaneous objection to the trial court's error was made, *and* (2) the issue was contained in a written posttrial motion." (Emphasis in original.) *People v. Rathbone*, 345 Ill. App. 3d 305, 308-09 (2003).

However, the supreme court has stated:

"The plain-error doctrine is a limited and narrow exception to the general rule of procedural default [citation] and allows a reviewing court to consider unpreserved error when one of two conditions is met:

'(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Walker*, 232 Ill. 2d 113, 124 (2009) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

¶ 43        While harmless-error analysis would apply in an instance where a jury instruction error was preserved for appellate review, plain-error analysis would apply when, as here, it was not. *People v. Hartfield*, 2022 IL 126729, ¶ 42. "The initial step in conducting plain-error analysis

is to determine whether error occurred at all. [Citation.] This requires us to conduct a substantive review of the issue." *Walker*, 232 Ill. 2d at 124-25. "Here, the issue of whether the jury instructions accurately conveyed to the jury the applicable law is reviewed *de novo*." *People v. Parker*, 223 Ill. 2d 494, 501 (2006). A reviewing court "must determine whether the instructions, taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Id.* In conducting such an inquiry, the instructions "should be construed as a whole, rather than read in isolation." *Id.* The supreme court has observed that "[a] jury instruction error, although one of constitutional magnitude, is not necessarily a structural error and therefore does not result in automatic reversal." *Hartfield*, 2022 IL 126729, ¶ 42.

¶ 44 What is at issue here is the contradiction between the jury instruction as to the State's burden of proof the trial court recited and the instruction subsequently provided in writing. In reading the instruction to the jury, the court stated, "If from your consideration of all the evidence that [*sic*] any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." The court correctly identified the two propositions the State must prove but concluded its recitation incorrectly as to the State's burden of proof, having stated the jury should find defendant guilty if "any one of these [two] propositions has been proved beyond a reasonable doubt." Subsequently, the court provided the written instruction, which correctly specified both propositions and the condition the jury find "each one *** proved beyond a reasonable doubt" in order to find defendant guilty.

¶ 45 Relying in particular on *Hartfield*, defendant contends the trial court's incorrect oral instruction amounts to plain error. In *Hartfield*, the defendant argued "that the giving of conflicting instructions amounts to second-prong plain error." *Id.* ¶ 57. In light of its earlier decisions in *People v. Haywood*, 82 Ill. 2d 540 (1980), and *People v. Jenkins*, 69 Ill. 2d 61 (1977),

the *Hartfield* court held:

> "Whereas a single erroneous instruction might be cured by other instructions or by some other showing of a lack of prejudice, two directly conflicting instructions on an essential element, one stating the law correctly and the other erroneously, cannot be cured this way due to the simple fact that we can never know which instruction the jury was following. What is at issue with this error is the integrity of the judicial system itself. Thus, regardless of whether it is plain-error or harmless-error analysis, such an error is presumed to be prejudicial." *Hartfield*, 2022 IL 126729, ¶ 59.

¶ 46　　　　The State directs us to two appellate court decisions, including one from this district, and argues that pursuant to them and their distinguishability from the supreme court decisions, the error of the trial court here would not amount to prejudicial, plain error. The first is *People v. Darr*, 2018 IL App (3d) 150562. In *Darr*, the trial court erroneously orally instructed the jury regarding the requisite age of the victim for a conviction of predatory criminal sexual assault of a child. *Id.* ¶ 37. The defendant asserted this error required reversal. *Id.* ¶ 51. The *Darr* court concluded the supreme court decisions, which involved "conflicts present in the written pattern instructions presented to the jury," did not dictate the outcome. *Id.* ¶ 82. The court then explained:

> "Moreover, when the jury instructions are considered as a whole, it is clear that there was absolutely no possibility that the jury was confused or would have felt compelled to choose between two different instructions. The circuit court's single misstatement was followed immediately by numerous correct instructions as to the

same element, both orally and in writing. \*\*\*

In sum, the circuit court's erroneous instruction in this case was made orally, only once, and immediately corrected numerous times. This stands in stark contrast to the uncorrected, contradictory written instructions that our supreme court had held to undermine the fairness of a trial." *Id.* ¶¶ 84-85.

¶ 47 The second decision is *People v. Dylan E. A.*, 2023 IL App (4th) 220503-U. In *Dylan E. A.*, the trial court erroneously recited the instruction pertaining to the State's burden of proof. *Id.* ¶ 19. The jury found the defendant guilty of both counts charged. *Id.* ¶ 22. At a hearing on a motion for a new trial, the trial court "found the written instruction controlled, and any error concerning the oral instruction would have been harmless." *Id.* ¶ 24. This court noted "multiple cases decided before *Hartfield* have held a correct written instruction cures an error in an oral reading of an instruction." *Id.* ¶ 35. We then explained:

"Here, we are not presented with multiple inconsistent written instructions. Instead, the trial court orally read the instruction once and then provided a correct written instruction. As a result, *Haywood*, *Jenkins*, and ultimately *Hartfield* are distinguishable. Indeed, the *Hartfield* court left open the possib[ility] for such a scenario when it stated, 'a single erroneous instruction might be cured by other instructions or by some other showing of a lack of prejudice.' *Hartfield*, 2022 IL 126729, ¶ 59. That is the circumstance here. Looking at the instructions as a whole, we find it unreasonable to believe the jury was actually confused by

- 17 -

the error." *Id.* ¶ 36.

We concluded "no plain error occurred." *Id.* ¶ 37.

¶ 48    Here, we adopt our rationale in *Dylan E. A.*, and we conclude no prejudicial, plain error occurred due to the trial court's erroneous oral jury instruction. As was the case in *Dylan E. A.*, "we are not presented with multiple inconsistent written instructions." *Id.* ¶ 36. Rather, there was one instance of an incorrect oral instruction, which was followed by a correct written instruction. *Id.* Additionally, viewing the jury instructions "as a whole," we find "it is clear that there was absolutely no possibility that the jury was confused or would have felt compelled to choose between two different instructions." *Darr*, 2018 IL App (3d) 150562, ¶ 84. Not only did the jury, regarding count II, receive the correct instruction in writing shortly after hearing it recited incorrectly, it also heard the correct instruction recited moments earlier in connection with the court's oral instruction on count I and received this correct instruction in writing afterwards. In total, the jury received, in this order, (1) a correct oral instruction, (2) an incorrect oral instruction, (3) a correct written instruction, and (4) a correct written instruction. As in *Darr*, "[i]n sum, the [trial] court's erroneous instruction in this case was made orally, only once, and immediately corrected numerous times." *Id.* ¶ 85. The instructions, "taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Parker*, 223 Ill. 2d at 501. As such, we conclude defendant failed to demonstrate the court's erroneous oral instruction amounted to prejudicial, plain error.

¶ 49    C. The State Did Not Shift the Burden of Proof During Closing Argument

¶ 50    Next, defendant argues the State attempted to shift the burden of proof to him during closing argument when it "argued that defense counsel did not explain why [defendant] did not say the revolver was a replica in the police interview." In response, the State contends, rather

than shifting the burden of proof onto defendant, it merely argued "reasonable inferences from the evidence." In reply, defendant asserts he "is not challenging the State's closing arguments as an independent basis for a reversal." Instead, defendant is arguing "the burden shifting in the State's closing argument contributed to the prejudice he experienced in the jury confusion in the incorrect jury instruction on the burden of proof." We have already concluded the trial court's erroneous oral jury instruction did not amount to plain error, requiring reversal. Nevertheless, we will address whether the State did, in fact, shift the burden of proof to defendant during its closing argument.

¶ 51        It is indisputable that the prosecution has the burden to prove the defendant guilty of the charged crime beyond a reasonable doubt. "The burden of such proof never shifts to the accused, but remains the responsibility of the prosecution throughout the trial." *People v. Weinstein*, 35 Ill. 2d 467, 470 (1966). In its initial closing argument, the State said:

> "You heard his interview. His interview, yeah. Where is the revolver? Now, if it's a prop, what's the answer? There ain't no revolver. It's a prop. I don't know. Is that revolver in your house? What's the answer? It's a prop. But he says, no, it's not in the house. Every question about the revolver, he agreed it was a real revolver. It's just gone."

In its rebuttal argument, the State said:

> "He had his chance. [Defendant's counsel] had his chance. And you didn't hear one answer to my point. When he was asked about the revolver in the interview, why didn't he say it was a prop? Is the revolver in the house? No, it's not. You know what when you say no, it's not? You are saying, yeah, it's a gun but it's not in my

house.

> Listen to this. *Silver Blaze*. Sherlock Holmes mystery. It was solved because of what didn't happen. What wasn't the facts. When the defendant did not at that time say that that was a prop, that wasn't a real gun, when he answered the question that the revolver is not in my house, that's a concession it's a revolver."

¶ 52 Our supreme court has explained that "[i]n closing, the State may comment on the evidence and all inferences reasonably yielded by the evidence." *People v. Blue*, 189 Ill. 2d 99, 127 (2000). In determining whether the State engaged in improper argument, "[c]losing arguments must be viewed in their entirety and the allegedly erroneous argument must be viewed contextually." *Id.* at 128. With these principles in mind, we conclude the State, through the comments at issue, did not shift the burden of proof onto defendant, but it expressed a fair comment on the evidence—defendant never told Detective Law the revolver was a prop or otherwise was not "real"—and argued a reasonable inference from that evidence—defendant conceded the revolver was a real firearm. This is different from "a clear argument that the jury should not give credence to defendant's theory because defendant did not present any evidence in support of that theory." *People v. Euell*, 2012 IL App (2d) 101130, ¶ 20. This also does not amount to an argument which, "although not designed to direct the attention of the jury to the defendant's failure to testify, [was] designed to direct the attention of the jury to questions defense counsel should have asked, which [would] improperly shift[ ] the burden of proof." *People v. Edgecombe*, 317 Ill. App. 3d 615, 622 (2000).

¶ 53 D. The Statute Prohibiting Felons From Possessing Firearms is Not

Unconstitutional, Either Facially or as Applied to Defendant

¶ 54　　　　　Finally, defendant argues that "[u]nder the test set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19 (2022), Illinois' unlawful possession of a weapon by a felon statute is inconsistent with this nation's historical tradition of firearm regulation" and is unconstitutional both on its face and as applied to him. Because this statute prohibits a felon from possessing a firearm "with no finding of a threat to the safety of others," it is facially unconstitutional. Because defendant's predicate felony conviction was for a nonviolent offense, this statutory prohibition is unconstitutional as applied to him. In response, the State points out the First District and this court have rejected challenges to this statute as facially unconstitutional and the Second District has rejected the argument that the statute is unconstitutional as applied to a defendant with a nonviolent predicate felony conviction. In reply, defendant contends the decisions of the First District and this court were wrongly decided.

¶ 55　　　　　As to the constitutionality of the challenged statute, we begin by noting:

"Statutes are presumed to be constitutional, and courts must construe legislative enactments so as to affirm their constitutionality if reasonably possible. [Citation.] The party challenging the validity of a statute has the burden of clearly establishing its constitutional invalidity. [Citation.] Whether a statute is unconstitutional presents a question of law, which we review *de novo*." *People v. Webb*, 2019 IL 122951, ¶ 7.

¶ 56　　　　　Defendant argues the statute prohibiting felons from possessing firearms is unconstitutional both facially and as applied to him. As our supreme court has explained:

"A statute is facially invalid only if there is no set of circumstances under which the statute would be valid. In contrast, an 'as-applied'

- 21 -

challenge protests against how a statute was applied in the particular context in which the challenging party acted or proposed to act. Accordingly, in an as-applied challenge, the challenging party's particular facts and circumstances become relevant. \*\*\* While a successful facial attack voids the statute in its entirety and in all applications, a successful as-applied challenge enjoins enforcement of the statute only against the challenging party." *People v. Gray*, 2017 IL 120958, ¶ 58.

¶ 57 Defendant acknowledges he did not preserve these constitutional challenges for appellate review, as he did not first raise them in the trial court. However, a challenge to the facial constitutionality of a statute "is one which is exempt from forfeiture and may be raised at any time." *People v. Doehring*, 2024 IL App (1st) 230384, ¶ 12. As for an as-applied challenge, which by its nature is "dependent on the particular circumstances and facts of the individual defendant or petitioner," it typically "is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *People v. Thompson*, 2015 IL 118151, ¶ 37. However, the supreme court has recognized an exception to this general requirement for a situation where the as-applied challenge "does not require factual development" in that "[a]ll of the facts and circumstances to decide the \*\*\* claim \*\*\* are already in the record." *People v. Holman*, 2017 IL 120655, ¶ 32, *overruled on other grounds by People v. Wilson*, 2023 IL 127666, ¶ 42. Defendant's claim this statute is unconstitutional as applied to him requires no additional factual development, as it can be decided based on pertinent case law and the fact that, as stipulated to at trial, he has been convicted of a predicate felony offense. Finding neither constitutional challenge has been forfeited, this court will consider them on the merits.

¶ 58          The second amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the United States Supreme Court held "the Second and Fourteenth Amendments [(U.S. Const., amends. II, XIV)] protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *Bruen*, 597 U.S. at 8-9. The Supreme Court subsequently held the protection of the second and fourteenth amendments extends to "an individual's right to carry a handgun for self-defense outside the home." *Id.* at 10. In *Bruen*, the Supreme Court set forth the analytical framework for evaluating claims under the second amendment, holding a person's conduct is presumptively protected if it is covered by the plain text of the second amendment, and the government must justify any regulation of the conduct by showing the regulation is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. An individual's conduct falls outside the protection of the second amendment only if the firearm regulation is consistent with this nation's historical tradition. *Id.*

¶ 59          The statute at issue provides, in pertinent part:

          "It is unlawful for a person to knowingly possess on or about his
          person or on his land or in his own abode or fixed place of business
          *** any firearm or any firearm ammunition if the person has been
          convicted of a felony under the laws of this State or any other
          jurisdiction." 720 ILCS 5/24-1.1(a) (West 2022).

¶ 60          This court considered a challenge to the facial constitutionality of this statute in *People v. Burns*, 2024 IL App (4th) 230428. There, we found the First District's decision in *People*

*v. Baker*, 2023 IL App (1st) 220328, "instructive." *Burns*, 2024 IL App (4th) 230428, ¶ 18. In *Baker*, the defendant argued this statute was facially unconstitutional pursuant to *Bruen*. *Baker*, 2023 IL App (1st) 220328, ¶ 37. The *Baker* court concluded the defendant's facial challenge failed, explaining:

> "The problem with defendant's argument is that *Bruen* just does not apply to him. The *Bruen* Court could not have been more clear that its newly announced test applied only to laws that attempted to regulate the gun possession of 'law-abiding citizens,' and not felons like defendant. *** Just in case a reader missed the first time that the court said it, the court repeated it 18 times. *** Further, Justice Kavanaugh in his concurrence quoted an earlier case that stated: ' "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons ***." ' *Bruen*, 597 U.S. at 1, 142 S. Ct. 2111 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 626-27, 128 S. Ct. 2783). Justice Kavanaugh's concurrence was joined by Chief Justice Roberts, and they both joined the six-justice majority opinion. Based on the plain, clear, and repeated language of the justices in the majority, defendant is simply outside the box drawn by *Bruen*." *Id.*

¶ 61     This court agreed with the *Baker* court's conclusion in *People v. Boyce*, 2023 IL App (4th) 221113-U, ¶¶ 14-16. After summarizing *Baker* and *Boyce*, this court in *Burns* held "that *Bruen* simply does not apply to [the] defendant." *Burns*, 2024 IL App (4th) 230428, ¶ 21.

We rejected the defendant's facial challenge, explaining:

> "As a felon, defendant, by definition, is not a law-abiding citizen. Thus, defendant cannot show that his conduct was presumptively protected by the second amendment, and therefore, he does not fall within the scope of *Bruen*. As a result, defendant cannot show that section 24-1.1(a) of the [Criminal] Code [of 2012] violates the second amendment on its face under the *Bruen* framework." *Id.*

In *People v. Gardner*, 2024 IL App (4th) 230443, ¶ 68, we maintained our conclusion in *Burns* that the *Bruen* framework did not apply to the defendant, rejecting an "identical" challenge to the statute as facially unconstitutional.

¶ 62       In his reply brief, defendant argues "*Burns* and *Baker* were wrongly decided" in light of the Supreme Court's decision in *United States v. Rahimi*, 602 U.S. 680 (2024). In December 2024, after defendant filed his reply brief, this court decided *People v. Pruitte*, 2024 IL App (4th) 240013-U, in which we once again rejected a challenge to this statute as facially unconstitutional. The defendant asked this court "to reconsider our decision in *Burns*" and noted "*Rahimi* did not decide whether the second amendment's protections apply to felons." *Id.* ¶ 35. We noted that while *Rahimi* "did not directly address the question before us," the Court "approvingly cited its statement in *Heller*" that statutory prohibitions against the possession of firearms by felons are presumptively lawful. *Id.* ¶ 36. We then cited 11 post-*Bruen* Illinois appellate court decisions "rejecting second amendment challenges to section 24-1.1(a)." *Id.* Ultimately, this court declined to reconsider *Burns* and declined the defendant's request to find this statute facially unconstitutional. *Id.* Considering the multitude of decisions from the appellate court (including this district) concluding a felon is outside the purview of the *Bruen* standard when

challenging this statute as facially unconstitutional, and in light of our decision in *Pruitte* concluding this was not altered by *Rahimi*, defendant's facial challenge fails.

¶ 63 Defendant argues the statutory prohibition against felons possessing firearms is unconstitutional as applied to him, as his predicate felony conviction was for a nonviolent offense. However, we agree with the observation of the Second District that "whether [a] defendant's qualifying convictions were 'nonviolent' is irrelevant, as the Supreme Court placed no qualifiers on the word 'felons' in either *Heller* or *McDonald*." *People v. Echols*, 2024 IL App (2d) 220281-U, ¶ 156. See *People v. Gross*, 2024 IL App (2d) 230017-U, ¶ 29 ("That defendant's underlying felony did not involve violence is immaterial, as the Supreme Court drew no such distinction in *Heller*, *McDonald*, or *Bruen*."). We furthermore agree with the First District in that "thus far, no case from this court has concluded that prohibition on firearms possession for felons is unconstitutional as applied to nonviolent felons, and defendant has failed to convince us to be the first." *People v. Martin*, 2024 IL App (1st) 221562-U, ¶ 78.

¶ 64                                    III. CONCLUSION

¶ 65 For the reasons stated, we affirm the trial court's judgment.

¶ 66 Affirmed.